**Gregory F. Wilson, Esq.**
**Nevada Bar No. 2517**
**GREGORY F. WILSON & ASSOCIATES, P.C.**
**417 W. Plumb Lane**
**Reno, NV 89509**
**(775) 786-7600 Telephone**
**(775) 786-7764 Facsimile**
**gwilson@wilsonquint.com**
        **and**
**Joel R. Hogue, Esq.**
**Texas Bar No. 09809720**
**Kevin Wakley, Esq.**
**Texas Bar No. 24042110**
**Chase Hales, Esq.**
**Texas Bar No. 24083124**
**IRWIN MERRITT HOGUE PRICE & CARTHEL, PC**
**320 S. Polk St., Suite 700**
**Amarillo, TX  79101**
**(806) 322-1440 Telephone**
**(806) 322-1441 Facsimile**
**jhogue@amalaw.org**
**kwakley@amalaw.org**
**chales@amalaw.org**

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| **FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER OF CARSON RIVER COMMUNITY BANK**<br><br>        **Plaintiff,**<br><br>    **vs.**<br><br>**JAMES M. JACOBS**<br>        **Defendant.** | **Case No.:** |

## **COMPLAINT**

## **JURY DEMAND**

The Federal Deposit Insurance Corporation ("FDIC"), in its capacity as Receiver of Carson River Community Bank ("Carson River" or "the Bank"), files its Complaint against the defendant James M. Jacobs ("Defendant" or "Jacobs"). The FDIC's attorneys will comply with LR 1A 10-2 within 45 days.

## I.    JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action pursuant to 12 U.S.C. § 1819(b)(1)-(2)(a) and 28 U.S.C. §§ 1331 and 1345. Supplemental jurisdiction over the FDIC's state law claims may be exercised by the Court under 28 U.S.C. § 1367.

2.      Pursuant to 28 U.S.C. § 1391(b), venue is proper in the District of Nevada because the claims and causes of action asserted in this Complaint arose in this district.

## II.    THE PLAINTIFF

3.      The FDIC is an instrumentality of the United States, established under the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811-1833(e).

4.      Carson River was chartered on October 16, 2006 by the State of Nevada. Carson River was a state nonmember bank whose shares of stock were widely held. The Bank operated out of a single location in Carson City, Nevada. Since its inception, the Bank was jointly examined by the FDIC and the State of Nevada.

5.      On February 26, 2010, the Nevada Department of Business and Industry, Financial Institutions Division closed the Bank, and the FDIC accepted appointment as receiver pursuant to 12 U.S.C. § 1821(c). As set forth in 12 U.S.C. § 1821(d)(2)(A)(i), the FDIC succeeded to all rights, titles and privileges of Carson River, and its stockholders, account holders and depositors.

### III.    DEFENDANT

6.    Defendant Jacobs was a co-founder and stockholder of the Bank.  He served as a director and member of the Senior Loan Committee of the Bank from its inception until his resignation from both positions in December 2008.  Jacobs also served as a member of the boards of directors and had ownership interests in three Oklahoma banks that participated in certain of the loans sued upon in this case. Jacobs is also an attorney.  Jacobs may be served with process at 181 Taylor Creek Rd., Gardnerville, NV  89460-6244, or in Oklahoma at 310 East Graham, Pryor, Oklahoma 74361.

### IV.    NATURE OF THE SUIT

7.    By this suit, the FDIC seeks to recover approximately $3.6 million in damages for losses incurred by Carson River in connection with three loan transactions, as described more particularly below. The losses were caused by the gross negligence and breaches of fiduciary duties of the Defendant, acting jointly and in concert with other members of the Senior Loan Committee.

8.    Jacobs, as a member of the Bank's Senior Loan Committee, voted to approve three loans to non-creditworthy borrowers for the purpose of paying off existing troubled loans at other banks.  None of the prior lenders desired to renew the loans.

9.    Through his vote to approve these three loans, Jacobs departed from the Bank's business plan and loan policies, violated regulatory requirements relating to appraisals, and chose to proceed despite substantial and accumulating known risks.

10.    Furthermore, Jacobs, who owned interests in three Oklahoma banks, helped arrange for two of his Oklahoma banks to buy loan participations in one of the loans described

herein, but sacrificed the interests of Carson River by including a provision in the participation agreement that assured repayment to his Oklahoma banks before Carson River.   The consequence of this was that the Oklahoma banks were paid in full and Carson River shouldered the bulk of the loss on the loan.

## V.   FACTUAL BACKGROUND

**A.   Carson River Background**

11.   Carson River received its charter on October 16, 2006.  It failed a little over three years later on February 26, 2010.

12.   The seeds of the Bank's failure were planted almost immediately after it was chartered.   The Bank's Board of Directors created a committee called the "Senior Loan Committee" and delegated lending authority to it.   Jacobs was a member of the five-member Senior Loan Committee.

13.   In 2007, the Senior Loan Committee approved three large residential real estate lot loans that were refinances of acquisition and development loans extended by other lenders who wished not to renew the matured loans.   The three loans described herein, all of which resulted in substantial losses to the Bank, fit into this pattern.  With the approval of each of the loans, the Bank's risk profile was increased.   These three loans constituted, in dollar amount, over 22% of the Bank's loan portfolio at the end of 2007, and over 63% of the Bank's reported equity capital.

14.   Jacobs knew at the time of the loan approvals that there were significant problems associated with the loans.  The Senior Loan Committee minutes and the credit memos presented to the committee before approval include comments such as the following:

- The prior lender "is discouraging the renewal of contractor lot loans."

-  "We are feeling (sic) the need for developers in the community seeking bridge loans to get them by during slow times."

- The market has "softened."

- The prior lender "no longer has an appetite for this type of loan."

15.    Carson City newspaper articles in late 2006 through 2007 also painted an uncertain and dismal view for the residential housing market in Nevada in general, and in the Carson City area in particular, as reflected by the following representative statements:

- "Fewer Carson City homes sold in August [2006] than a year ago…The data also shows houses are also spending more time on the market and costing 11 percent less than a year ago."—*Nevada Appeal*, October 2, 2006.

- "Industry analysts predict prices will continue to decrease as sellers become more desperate and buyers hold out for more competitive pricing while interest rates for a 30-year mortgage stay under 7 percent."—*Nevada Appeal*, October 2, 2006.

- "After a five-year national housing boom the market had started to slow over the year into a hot pool of uncertainty."— *Nevada Appeal*, October 7, 2006.

- "House flippers in Carson City are in trouble, according to a forecast by Moody's Economy.com, a private research firm.  Its predictions are called, 'one of the starkest views yet of the housing slow-down.'"—*Nevada Appeal*, October 7, 2006.

- "Boom areas of Nevada could have the most dismal price slump in the nation."— *Nevada Appeal*, October 7, 2006.

- "Carson City is on the list of metropolitan areas projected to have the largest decline in median housing prices."—*Nevada Appeal*, October 7, 2006.

-  "The U.S. will dodge the recession bullet, but a weakening national housing market will continue to be felt throughout the nation in 2007…"— *Nevada Appeal*, November 29, 2006.

-  "The number of mortgage defaults by Carson City homeowners increased 47% from 2004 to 2006,…'[The real estate market in Carson City] was way over priced and people got in on interest only loans and 100% loans and got in way

over their heads'…In late 2005 and 2006, the speculators ran out of buyers… '[I]n 2006 things got worse, most people shrugged their shoulders, they couldn't find a buyer, so they let the lender take it'…'I do believe we are going to see more defaults and foreclosures due to lending, the 100 percent loans and the ARMs (adjustable rate mortgages), because people are overburdened with interest rates that have gone up…I think for the next six months we'll be seeing that. Then we'll see how the economy does.'"— *Nevada Appeal*, January 13, 2007.

- "Last year, Carson City's housing market saw the fewest amount of homes sold in 18 years . . ." --- *Nevada Appeal*, January 28, 2007.

- "The market is full of homes from speculators who bought intending to resell soon after at a huge profit that they'll never see.  Many of those homes are likely to become rental properties."—*Nevada Appeal*, January 30, 2007.

- "Nevada's foreclosure rate led the nation when it rose 220% from a year earlier to 4,738 filings, or one in every 183 households."—*Nevada Appeal*, April 28, 2007.

- "Booms are always followed by busts, and those who don't heed this reality are doomed to be busted the worst…Now, the boom—and the bust—is in the housing market."— *Nevada Appeal*, August 11, 2007.

- "Nevada now leads the nation in the percentage of foreclosures, with one out of every forty homeowners losing their home."— *Nevada Appeal*, August 11, 2007.

- "Now that the party is over, all that's left is the mess, and the mess threatens to take down the entire economy.  It could make the dot com meltdown look like a picnic."— *Nevada Appeal*, August 11, 2007.

16.    The credit memos and other documents available to Jacobs and the Senior Loan Committee before loan approval noted numerous material weaknesses with the loans.  Most notably the loans to be repaid by the Bank's advances were already troubled loans at other banks and lending institutions.  Two of the three loans funded by the Bank were noted as the subjects of possible extension upon maturity.  All three loans had built-in interest reserves so that interest only payments were made by the Bank for the benefit of the borrowers for periods ranging from six months to two years.  As a consequence, the borrowers had no scheduled payment responsibilities under the loan agreements until six months to two years later.  In one instance,

the Senior Loan Committee, including Jacobs, approved the advance of funds to not only pay the prior lender the outstanding principal, but also over $190,000 in past due interest and late charges, as well as a third party $64,500 mortgage originator fee for bringing the defaulted loan to the Bank.

17.     The Senior Loan Committee, including Jacobs, counted on sales of lots or completed homes to reduce the principal on the loans.  The Senior Loan Committee, including Jacobs, relied on liquidation of the collateral and loan guaranties as the ultimate protection in the event of default.  The appraisals relied upon were retail appraisals of individual lots, rather than bulk appraisals of all the lots as should have been required given the slowness of the real estate market, the fact that the lots were owned by the borrower in bulk, and the loans were already troubled.  In one instance, the Bank had a bulk appraisal in its file before loan funding that revealed a significantly lower value than reflected in the retail appraisal – and which was almost $1 million less than the approved loan amount – but Jacobs and the Senior Loan Committee permitted funding anyway.

18.     The Senior Loan Committee, including Jacobs, placed reliance on personal guaranties of the principals of each of the borrowers as secondary support for the loans.  The financial statements supplied by the guarantors often showed substantial apparent net worth, but in all instances the net worth was tied to highly illiquid real estate investments that depended on the health of the real estate market.  The reported net worth of the guarantors also frequently included exempt homesteads.  None of the real estate values appear to have been verified.  Upon default, the guarantors resisted collection, threatened bankruptcy, and the guaranties proved to be worthless in the hands of the Bank.  Defendant Jacobs, at a later point in time, wrote an e-mail to

a number of Bank officers and directors and pointed out that there are numerous "ways where a guaranty is not worth the ink on the page. . ."

19.     The Bank's business plan submitted in connection with its application for FDIC insurance indicated the Bank's intention to market to "contractors and developers in order to capitalize on the area's primary growth sector," but it made no mention of the Bank's intention to market to troubled developers and contractors whose loans were rejected by other lenders. The business plan expressly stated that the "Bank has no plans to engage in speculative activities or high risk lending, such as sub-prime, high loan-to-value or speculative lending." Yet, the loans described herein relied for their success almost solely on speculation that the real estate market would turnaround and that the troubled borrowers, with the benefit of six months to two years of deferred interest, would ultimately be able to service the debt to the Bank.

20.     The Bank's loan policy recognized the value of the following loan attributes:

- "The value of having a diversified loan portfolio as a method of minimizing risk is recognized by the Board of Directors."

- "It is prudent to diversify assets so that a recession in one industry will have only a limited impact on the total assets of the Bank."

- Acquisition and development loans "are to be granted on a very selective basis to qualified developers of substantial net worth and considerable experience."

These policy statements were largely ignored by the Senior Loan Committee, including Jacobs.

21.     The Bank's loan policy also included a section on appraisals. The appraisal policy required that the Bank's standards for appraisals meet federal regulations and guidelines. The Bank relied on individual retail lot appraisals. Under the circumstances of the refinanced loans described herein, "bulk value" appraisals were more appropriate since the loans were to real estate developers and not individual owners. Bulk value appraisals were particularly

important in these circumstances because the loans were to troubled developers during a time when there were recognized problems in the real estate market.

22.     The failure of the Senior Loan Committee, including Jacobs, to require bulk value appraisals violates the minimum appraisal standards that require the bank to "[a]nalyze and report appropriate deductions and discounts for . . . tract developments with unsold units."  12 C.F.R §323.4 (c).  This is further explained by Interagency Appraisal and Evaluation Guidelines (1994) that states with respect to the above standard as follows:

> This standard is designed to avoid having appraisals prepared using unrealistic assumptions and inappropriate methods in arriving at the property's market value . . . For proposed developments that involve the sale of individual houses, units, or lots, the appraiser must analyze and report appropriate deductions and discounts for holding costs, marketing costs and entrepreneurial profit.

Bulk value appraisals take these deductions and discounts into account, whereas retail appraisals, do not.

23.     The Bank also lacked necessary manpower to properly process, analyze, and document the sizeable loans extended by the Bank in its early existence.  July 2007 board minutes reflect that the "loan department is overworked and could use some help."

24.     Most egregious, however, is the conduct of Jacobs who sacrificed the interests of Carson River in favor of Oklahoma banks in which he had substantial interests.  Two Oklahoma banks, in which the Jacobs family owned majority interests and he served as a director, were participants in a Carson River loan.  These facts were known by his fellow Senior Loan Committee members, but with the exception of the chief credit officer, it was unknown by the other committee members and the Board of Directors that Jacobs' Oklahoma banks were granted preferential rights to repayment on default.  Later, when confronted by the Bank's Board of

Directors about this conflict of interest, Defendant Jacobs vehemently denied knowledge of the preferential rights to repayment. The Board of Directors believed Jacobs and relented in their investigation of the matter.  Unknown to the Carson River Board of Directors was that the board minutes of one of the Oklahoma banks show conclusively that Jacobs knew of the preferential arrangement from the outset.

**B.     The Loans**

**1.     Dayton Valley Land, LLC**

**a.     The Loan Request**

25.     Dayton Valley Land, LLC ("Dayton Valley") requested a $2,150,000 loan from the Bank in early 2007.  The loan request came to the Bank from a loan broker.  The purpose of the requested loan was to refinance 25 residential lots in the Nantucket subdivision located on Six Mile Canyon Road in or just outside of Dayton, Nevada.  Dayton Valley requested the loan for the purpose of paying off a loan obligation to a non-bank lender and to fund a one-year interest reserve.

**b.     The Loan Underwriting**

26.     At the time of the loan request to Carson River, the Dayton Valley loan was past due to the prior lender.  The prior lender had threatened to foreclose the collateral securing the loan if the loan were not paid in full.

27.     The Nantucket subdivision was located in a remote location relative to other residential subdivisions in the Dayton-Carson City area.  The development was surrounded by less desirable lower cost housing, high voltage power lines, and the cul-de-sac lots were split by a large detention basin fenced with chain link.

28.     Information supplied by Dayton Valley's principal to the loan broker, and in turn supplied to the Bank's chief credit officer, revealed that the principal's prior business associate created problems for him that caused him to buy out his associate.  The principal was under distress to keep pace with the monthly interest payments due to the prior lender that were accruing at the rate of twelve percent (12%) per annum.

29.     The chief credit officer prepared the credit authorization memorandum associated with the Dayton Valley loan request for consideration by the Senior Loan Committee.  The chief credit officer noted in the memo that "the market in the Dayton area has softened somewhat" but noted his view that there remained a market for this type of product.

30.     According to the credit authorization memo, the loan-to-value ratio was 59% based on the $2,150,000 loan and an individual retail appraisal of the lots totaling $3,675,000, as of January 9, 2007.  The Bank's loan policy and federal regulations dictated that the ratio could not exceed 75%.  In reality, the appraisal covered only one lot with an opinion of market value of $147,000.  The chief credit officer reached the total appraised value of the lots by simply multiplying that number by 25, the total number of unsold lots in the development.

31.     The credit memo noted that the appraisal relied upon comparable sales "in areas similar to the subject property and are considered proper," but even a cursory review by the Senior Loan Committee, including Jacobs, of the appraisal would have shown that the comparable sales relied upon by the appraiser as support for his opinion of value were lot sales from a higher-end residential development in a superior location closer to the central business district of Dayton and to Carson City.  No adjustments were made to these superior lot sales to account for the difference.  Furthermore, the appraisal noted that "Some of the comparables are

older than six months as their (sic) are very few if any recent vacant land sales in the market area."

32.    More critical, however, is the fact that the Senior Loan Committee, including Jacobs, did not require the receipt of an appraisal of the bulk value of all 25 lots.   As a consequence there was a failure to account for the likelihood, given the defaulted nature of the prior loan and the admitted soft market in the Dayton area, that the lots might not sell on an individual retail basis (within one to three months as contemplated by the appraiser) and it would be necessary to liquidate the entire 25 lot inventory in bulk.

33.    In this case, the appraiser was not asked to value the entire 25 lot development for sale in bulk.   Consequently, no deductions and discounts were reported in the appraisal relied upon by the Senior Loan Committee, including Jacobs, to take into account such things as appropriate holding costs, marketing costs, entrepreneurial profit, and sales absorption periods. Had the appraiser done so, the value of the entire development would have been substantially lower than the chief credit officer's calculated value of $3,675,000 and the loan would have violated the maximum loan-to-value ratio required by the Bank's loan policy and federal regulations.

34.    The outstanding debt owed to the prior non-bank lender was distressed.   Under those circumstances, Carson River was in a position to try to acquire the outstanding debt from the non-bank lender at a discounted amount.   No effort was undertaken by the Senior Loan Committee, including Jacobs, to negotiate for a discount, and instead the Senior Loan Committee, including Jacobs, agreed to allow Carson River to finance all of the principal, all of the outstanding interest, all of the late charges, and a loan broker fee.

35.     There was, however, potential secondary support for the loan in the form of the liability of Dayton Valley and two guarantors of the debt.  This secondary support was illusory.

36.     Because Dayton Valley's only assets were the lots committed to the project, it was not a source for repayment of the loan other than through the sale of the collateral lots.

37.     Instead, the Senior Loan Committee, including Jacobs, looked at the guarantors as the only realistic secondary source for repayment.  At first blush, this reliance appears justified as the guarantors presented a financial statement showing a net worth of over $8 million.  But a closer examination revealed that $1,900,000 of the guarantors' stated net worth arose from the valuation of the interest in Dayton Valley.  This valuation was very doubtful for the reasons already described and added no secondary source of recovery that the Bank did not already have.

38.     Beyond this the vast majority ($7,223,102) of the guarantors' reported net worth arose from ownership interests in real estate notes secured by second lien positions in real estate located in nine different states.  The situation was further complicated by the fact that almost all of these properties were owned by limited liability companies in which the guarantors were only part owners.  Liquidation of these interests upon a loan default would be very difficult and expensive.  The process would involve obtaining a deficiency judgment against the guarantors.  Then, because the guarantors only owned a portion of the interests in the limited liability companies it would require legal steps to foreclose those interests in order to posture the Bank in an ownership position in the limited liability companies.  Then it would require partnering with other members of the limited liability companies and persuading them to foreclose the second lien positions in the real estate owned by the limited liability companies, if those loans were in default, and this would involve paying off almost $6 million in first lien positions to foreclose

the properties in order to tap into the equity, if any really existed.  Finally, this would involve multiple lawsuits in nine different states.  The point is the guarantors' financial statement, which even if accepted at face value as correct, reflected the guarantors' reported wealth was tied up in highly illiquid real estate and limited liability companies that would be very difficult and expensive to liquidate and collect.

39.     The loan matured in March 2008 and was not paid.

       **c.     The Approval**

40.     Defendant Jacobs met in a Senior Loan Committee meeting on February 22, 2007 to consider the loan request of Dayton Valley.  In the span of 44 minutes, the Senior Loan Committee, including Jacobs, considered two loans, including the Dayton Valley loan. Defendant Jacobs and the Senior Loan Committee, acting jointly and in concert with one another, voted unanimously to approve the Dayton Valley loan.  The loan funded on March 12, 2007.

41.     After approval of the loan, but before funding, Nevada Lenders, Inc. agreed to buy a 50% participation in the loan.  Nevada Lenders was an affiliate of or name under which First Pryority Bank of Pryor, Oklahoma did business in Nevada.  The president of Nevada Lenders, Defendant Jacobs, executed the participation agreement.  Defendant Jacobs was a Carson River director and one of the members of the Senior Loan Committee that approved the loan.

42.     At closing, Carson River paid off the entire principal balance owed to the prior lender in the amount of $1,678,889.43, accrued outstanding interest of $21,825.57, late fees of $167,888.94, and the loan broker's fee of $64,500.  The Bank also funded an interest reserve of

$181,025.76 on behalf of the borrower to pay for accruing interest for the entire one year term of the loan.

### d.    The Collection Efforts

43.    The Bank foreclosed the residential lots in September, 2008.  The Senior Loan Committee, including Jacobs, authorized the chief credit officer to credit bid $2,166,540.28 at the foreclosure sale, an amount that represented the entire principal balance due and owing by Dayton Valley, including a portion of funds paid on its behalf from the interest reserve account.

44.    The Senior Loan Committee, including Jacobs, relied on a March 4, 2008 appraisal of 24 of the 25 remaining lots and a February 13, 2008 appraisal of a partially finished house on the 25th lot in determining the credit bid.   The March 4th appraisal of the 24 lots contained an "as is" bulk value of $1,250,000 and a $2,040,000 aggregate retail value for the 24 lots.  The unfinished house was appraised at $90,500.

45.    Inexplicably, the Senior Loan Committee, including Jacobs, acting jointly and in concert with one another, chose to rely on the individual retail appraisals of the 24 lots in formulating the bid price when it was readily apparent by September 2008 that lot sales were not occurring and the bulk value was a much more accurate opinion of the fair market value of the property.

46.    Additionally, a new appraisal was obtained the month following the foreclosure sale which showed a further decline in the bulk value of the lots from $1,250,000 to $800,000. Had a new appraisal been obtained prior to the foreclosure sale in all likelihood the appraised bulk value would have been closer to the October 2008 valuation of $800,000 rather than the March 2008 valuation of $1,250,000.

Case 3:13-cv-00084-RCJ-VPC   Document 1   Filed 02/22/13   Page 16 of 34


47.     As a consequence of this bidding strategy, the Senior Loan Committee, including Jacobs, acting jointly and in concert with one another, limited the potential liability of Dayton Valley and the guarantors of this debt by at least $790,000 ($2,040,000 – $1,250,000).  The Bank pursued a deficiency judgment in the amount of $168,380.06.  Exactly how this deficiency amount was calculated is not clear, but if correct, the deficiency could have been at least $958,380.06 (i.e. $790,000 + 168,380.06) if the Senior Loan Committee, including Jacobs, had authorized a bid based on the March 2008 bulk value of the 24 lots.

48.     Consequently, even if the guarantors of the debt were willing and capable of paying the debt owed to the Bank, this bidding strategy assured that only a fraction of the debt had a chance to be collected.

### e.     The Gross Negligence and Breaches of Fiduciary Duty

49.     The Dayton Valley loan request was approved unanimously by the Senior Loan Committee, including Jacobs, acting jointly and in concert with one another, despite at least the following:

- The prior loan had matured, was in default, and the prior lender had threatened foreclosure.

- The Dayton Valley market was acknowledged to be soft and contemporaneous Carson City news accounts reflected record residential foreclosure rates, declining values, historically slow sales rates, and other disquieting news.

- The appraisal relied upon to support the loan did not report appropriate deductions and discounts to account for a bulk sale of the unsold lots if the real possibility of foreclosure came to pass.

- The Senior Loan Committee, including Jacobs, either failed to understand the necessity of obtaining a bulk value appraisal under the circumstances or knew that one should be obtained but failed to require one.

S:\JHOGUE\7051-FDIC\05-Carson River (D&O)\006.docx                                          Page 16 of 34

- The Senior Loan Committee, including Jacobs, failed to review, analyze, and understand the appraisal obtained in connection with the proposed loan. If Jacobs had done so he would have learned that the supposed comparable sales were for lots in a superior development and that the appraiser had difficulty finding current comparable sales because there were very few if any recent sales in the market area.

- The contemplated loan called for the Bank to loan funds for outstanding interest, late charges, and a broker's fee, all totaling approximately $250,000.

- The borrower had no obligation to pay interest until the loan matured a year later.

- The Senior Loan Committee, including Jacobs, failed to analyze the financial statement of the guarantors. If Jacobs had done so he would have concluded that the guarantors were highly illiquid and liquidating the guaranties would have been very costly and would result in little, if any, recovery.

- The Senior Loan Committee, including Jacobs, failed to preserve a meaningful deficiency balance against the borrower and guarantors because of the flawed bidding strategy undertaken.

### f.    The Damages

50.    The estimated losses proximately caused by the actions and failures to act of the Senior Loan Committee, including Jacobs, are as follows:

Principal amounts advanced

| | | |
|---|---|---|
| Initial disbursement | $1,938,388.14 |
| Half origination fee to Nevada Lenders | $32,250.00 |
| Flood certificate | $15.00 |
| Foreclosure fees – 24 lots | $25,066.59 |
| Taxes | $29,456.62 |
| Appraisal | $3,400.00 |
| Legal | $1,947.50 |
| **Total** | **$2,030,523.85** |

Recoveries

| | |
|---|---|
| Lot sale – 158 Cambridge Drive | $81,573.49 |
| Value of 24 remaining lots (est.) | $175,000.00 |
| Total | $256,573.49 |
| Loss on loan | $1,773,950.36 |
| **Bank's 50% share of loss** | **$886,975.18** |

**2.      C. Grant Development**

      **a.      The Loan Request**

51.      C. Grant Development, LLC ("Grant Development") requested a $2,000,000 loan from Carson River on May 1, 2007.

      **b.      The Underwriting**

52.      The chief credit officer prepared the credit authorization memo for circulation to the Senior Loan Committee.  According to the memo, the purpose of the loan was to refinance 17 lots located in the Santa Maria Ranch subdivision in Dayton, Nevada.  Three sources of repayment were identified: (1) sales of lots, (2) liquidation of collateral, and (3) personal assets. The loan was a refinance of a loan at Business Bank of Nevada (now City National Bank), which, according to the credit authorization memo, "no longer has an appetite for this type of loan."

53.      Comments from the prior lender's senior loan committee, as reflected in the following excerpts from their March 22, 2007 meeting minutes regarding a requested extension, reveal at least some of the objective problems associated with the borrower's situation:

- The loan officer "felt an appraisal updated at this very trough of a market correction would certainly yield negative forecast on the subject property's value . . ."

- Another committee member said "that continued tighter measures are now necessary (unlike 6 months ago) due to the potential deterioration in property values."

- An "appraisal update is necessary to gauge the bank's collateral position given the softening residential sector over the past month."

- In the one and one-half years' time since the prior lender financed the borrower, only three lot sales out of the 20 lots pledged as collateral were sold.

54.     Carson River's chief credit officer acknowledged the weak real estate market in his credit memo when he stated as follows:

> This loan will payoff Business Bank and provide an interest reserve.  Due to the weakness in the R/E market, we are extending this credit for 24 months with a review at maturity for a possible extention [sic].

The memo also reported that 2006 and 2007 had been slow years.

55.     The loan was collateralized by a first lien deed of trust on the 17 lots.  The Senior Loan Committee, including Jacobs, relied on a retail value appraisal completed on July 11, 2007 that valued each of the 17 lots at a combined value of $2,740,000, yielding a 73% loan-to-value ratio.  A bulk value appraisal would have been substantially less and given a truer indication of value because of the acknowledged slow real estate market, the fact the lots were owned in bulk by a developer, and the likelihood a foreclosure might become necessary.  A bulk value appraisal would also have revealed that the proposed loan would violate the Bank's loan policies and banking regulations.  The credit memo noted that the borrower expected it would take 18 to 24 months to sell the lots, "but with the uncertainty of the market, it may take a little longer."  This further added to the necessity of obtaining a bulk value appraisal.

56.     The guarantors of the loan, a husband and wife, submitted a sworn financial statement with a reported net worth of $2,122,134.  Of that, $550,000 was the homestead exemption associated with their personal residence.  Another $108,453.36 was tied up in exempt individual retirement accounts and annuities.  Another $77,500 was tied up in largely inaccessible personal property.  The balance of their net worth was almost entirely composed of equity in real estate for which the values were unsubstantiated.

57. Carson River participated $800,000 of the $2,000,000 loan to Nevada Lenders, Inc., a financial institution affiliated with Defendant Jacobs.

58. The loan matured in August 2009 and was not paid.

### c. The Approval

59. Less than three months before consideration of the C Grant Development loan by the Senior Loan Committee, one of the Senior Loan Committee members voted against the re-finance of another loan to a different developer, but in the same development, because of concerns the Bank was accumulating too many lot loans in the Dayton area.

60. Despite the dark storm clouds gathering around the residential real estate sector in the Dayton area, the Senior Loan Committee meeting minutes for July 5, 2007 reflect that Defendant Jacobs and the Senior Loan Committee, who were acting jointly and in concert with one another, voted unanimously to approve the loan in a meeting that lasted 65 minutes and included consideration of another loan.  According to the minutes, "We are feeling [sic] the need for developers in the community seeking bridge loans to get them by during slow times.  Interest reserves are built into this credit, so that there will be sufficient funds to service the debt for the two year line period."  Approval of this loan increased the Bank's exposure to Dayton area lot loans at a time when there was growing evidence of the stagnation of the real estate market for properties of this type.

### d. The Gross Negligence and Breaches of Fiduciary Duty

61. The Senior Loan Committee, including Jacobs, acting jointly and in concert with one another, approved the C. Grant Development loan despite at least the following:

- No bulk appraisal of the 17 lots was obtained under circumstances where lot sales in the market area had slowed, the prior lender would renew only for a limited time and under

tight restrictions, only three lots of the original 20 lots had sold in the past year and one-half, the borrower expected it would take 18 to 24 months to sell the lots, and the likelihood that foreclosure would be required was high.

- The appraisals relied upon were retail in nature and noted that "their (sic) have been few sales of similar vacant land parcels over the past 12 months."

- One of the Senior Loan Committee members was of the opinion less than three months before that there was a slowdown in the real estate market and the Bank was accumulating too many lot loans in the Dayton area.

- Contemporaneous Carson City news accounts reflected record residential foreclosure rates, declining values, historically slow sales rates, and other disquieting news.

- The guarantors' financial statements reflected a $2.1 million net worth, but that was composed almost entirely of property that was exempt from execution or was reported equity in real estate that would be difficult and expensive to collect.

### e.   The Damages

62.   The estimated losses proximately caused by the actions and failures to act of the

Senior Loan Committee, including Jacobs, are as follows:

**Principal amounts advanced**

| | |
|---|---|
| Initial disbursement | $1,674,720.37 |
| Appraisal | $3,300.00 |
| Flood certificate | $30.00 |
| Second disbursement | $449.59 |
| Draw 1 | $2,021.29 |
| Draw 2 | $8,011.88 |
| Draw 3 | $129.25 |
| Draw 4 | $14.88 |
| Draw 5 | $326.94 |
| Draw 6 | $339.00 |
| Draw 7 | $9,000.00 |
| Draw 8 | $239.00 |
| Draw 9 | $1,917.54 |

|  |  |  |
|---|---|---|
| Draw 10 | | $6,960.01 |
| Draw 11 | | $2,004.26 |
| Draw 12 | | $353.94 |
| Draw 13 | | $4,955.65 |
| Draw 14 | | $380.00 |
| **Total** | | **$1,715,153.60** |

**Recoveries**

|  |  |  |
|---|---|---|
| | Lot sale - 413 Milano Court - 10/18/07 | $97,203.98 |
| | Residence sale - 117 Denio Drive - 10/20/08 | $322,285.61 |
| | Post closure sale to Beal Bank - 5/27/10 | $268,179.02 |
| | **Total** | **$687,668.61** |
| **Loss on loan** | | **$1,027,484.99** |
| **Bank's 60% share of loss** | | **$616,490.99** |

3.    **Merrill Construction, Inc.**

a.    **The Loan Request**

63.    In the month following the approval of the C. Grant Development loan, Merrill Construction, Inc. ("Merrill Construction") requested a $4,000,000 loan from Carson River on August 16, 2007. The purpose of the loan was to refinance the development of 25 lots in Saratoga Springs Estates in Minden, Nevada. The loan was to pay off an existing loan extended by Business Bank of Nevada (now City National Bank). City National wanted out of the loan or at least wanted to reduce its exposure on the loan. While the lots were located in an established development not in the Dayton area, it represented yet another large loan and, if approved, would add substantially to the Bank's accumulation of risk in the refinancing of stalled residential real estate developments.

b.      **The Loan Underwriting**

64.     The chief credit officer prepared the credit authorization memo for circulation to the Senior Loan Committee, including Jacobs, and stated that, "The market is slow, but there is sign of increased buyers' activity for newly constructed homes."  The memo also stated that the loan would be "written for 24 months with review of maturity for an extension."

65.     The loan was to be collateralized by a deed of trust lien covering the 25 lots.  The chief credit officer obtained individual retail appraisals of each of the lots totaling $5,000,000. The calculated loan to value ratio, using this appraisal, was 80%, an amount that exceeded both the Bank's loan policy and federal regulations.  No bulk value appraisal was obtained before the loan was presented to the Senior Loan Committee.

66.     The secondary sources for repayment were the borrower and the guarantors.  The chief credit officer compiled financial information in the credit authorization memo about the borrower and guarantors.

67.     This compiled information reflected that the borrower, Merrill Construction, lost $153,000 in 2005 and lost another $379,000 in 2006.  By the end of 2006, Merrill Construction reported a negative net worth of $29,000.   Hence, Merrill Construction was not a viable secondary source for repayment.

68.     The principals of Merrill Construction, a husband and wife, guaranteed the loan. The chief credit officer compiled financial information in the credit authorization memo on the guarantors which oddly showed an identical balance sheet for the guarantors for each of the years ending December 31, 2004, 2005, and 2006.   The summary reflected a net worth of $3,753,000 for each of those years, but the vast majority of this reported net worth was tied up in

assets such as their homestead and retirement accounts that were exempt from execution and therefore were not available to satisfy the guaranties. The rest of their reported net worth was tied up in two pieces of real estate with outstanding liens, debt owed by Merrill Construction to the guarantors, and various personal belongings. Little analysis of the guarantors' financial situation was performed to determine the validity or accuracy of the information supplied and, even if accepted at face value, collection would have been difficult, expensive, and likely fruitless.

### c.        The Approval

69.     The Senior Loan Committee meeting minutes for August 23, 2007 reflect that Defendant Jacobs and the Senior Loan Committee, who were acting jointly and in concert with one another, voted unanimously to approve the loan, despite the fact the minutes also reflect that "City National Bank is discouraging the renewal of contractor lot loans. Loan will be written for 24 months to include interest reserve." The loan was approved, along with two others, in a meeting that lasted one hour and 45 minutes.

### d.        The Conflict of Interest and the Oklahoma Loan Participations

70.     The loan amount exceeded the Bank's legal lending limit to one borrower so it required selling loan participations to other lenders. Consequently, after approval of the loan the chief credit officer undertook to find loan participants. At least four potential participants rejected the opportunity.

71.     The chief credit officer worked with Defendant Jacobs in an effort to line up Jacobs' three Oklahoma banks as participants. The three banks were First Pryority Bank, Pryor, Oklahoma (which did business in Nevada through an affiliate known as Nevada Lenders, Inc.),

Bank of Locust Grove, and Lakeside Bank of Salina.  Defendant Jacobs and his family held majority ownership interest in all three Oklahoma banks and he sat on the boards of directors of all three banks.  These banks typically conducted their board meetings in succession on the same date in the same location.

72.     On September 12, 2007, in the second of those bank board meetings, the president of Lakeside Bank of Salina rightly determined that the loan was risky for his bank and conditioned approval on receiving a preferential right to repayment.  Consequently, participation in the Merrill Construction loan by Lakeside Bank of Salina in the amount of $250,000 (i.e. 6.25% of the approved loan amount) was approved with the board minutes reflecting "with our part last in and first out" meaning Lakeside Bank would be last to participate, but be the first to be paid.  On that same date, the board of directors of the third Oklahoma bank, Bank of Locust Grove, approved its participation on the same basis.  Defendant Jacobs attended both meetings and voted in favor of both loan participations on the "last in, first out" basis in direct contravention of the interests of Carson River and in violation of federal banking conflict of interest regulations.

73.     When the Merrill Construction loan was considered by Carson River's Senior Loan Committee it was understood that loan participants would be required and that Defendant Jacobs Oklahoma banks might participate, but it was not discussed or understood by other members of the Senior Loan Committee that some of the loan participants, including two of Defendant Jacobs' banks would be granted the right to be paid first in the event of default to the prejudice of Carson River.

74.     In May 2009, it became apparent to Carson River's Board of Directors that the Merrill Construction loan would soon be in default so the loan documents were reviewed in preparation for attempts to collect the debt.  By this time, Defendant Jacobs and the chief credit officer had resigned from their positions with Carson River.  As a result of the review, it was discovered that Lakeside Bank, Bank of Locust Grove, and City National Bank (the prior lender) were entitled to be paid their collective $1,000,000 contributions, before Carson River was paid anything.  As a consequence, 75% of the loss on this loan was shouldered by Carson River despite the fact it only advanced half of the loaned funds.

75.     This revelation shocked Carson River's Board of Directors.   The Bank's Executive Vice President was directed by the Board of Directors to send a letter to Defendant Jacobs about the matter.  Among other things, the Executive Vice President stated that, "The Board and Loan Committee members were unaware [the last in, first out language] had been inserted into the participation agreement and stated they did not approve this clause at all."  The tone of the letter was respectful but direct as she advised that the Bank had consulted with outside counsel who raised conflict of interest issues and possible "interested director" violations.  The Executive Vice President further requested Defendant Jacobs' cooperation in hopes that they might avoid the need "to determine if there is a reportable event for potential [directors and officers liability insurance coverage] as well as notice to the regulators by all of the banks involved."

76.     Defendant Jacobs responded vigorously by e-mail.  Among other things, Jacobs stated as follows:

> [The Bank's attorney] makes these interested director accusations based upon his theory that I knew about the [last in, first out] contract and that I should have

complied with various Nevada requirements relating to a conflict of interest.  If I did have the advance knowledge, then I would legally agree.  Once again, the facts bear me out that I had no knowledge of this arrangement until long after the participation agreement had been arranged between Oklahoma and [the chief credit officer]. . . If my recollection is faulty relating to the time sequence and I was asked about participation in advance of approval by the loan committe (sic), I can assure you that ABSOLUTELY NOTHING was ever discussed about preferential treatment for CitiBank, Salina or Locust Grove. . . I do not and can not agree that this requires a [directors and officers] insurance claim and I take stringent exception to notifying regulators and bonding companies that I violated ANY conflicts of interest.  I have to have had knowledge in advance and you are sorely lacking in the ability to prove a non existent knowledge."

77.     Defendant Jacobs' strident denials are belied by the board minutes of Lakeside Bank of Salina, the testimony of the presidents of Lakeside Bank of Salina and Bank of Locust Grove, and Jacobs' signature on the participation agreement.

78.     Carson River's Board of Directors believed Defendant Jacobs and pursued no further investigation.  Neither was any report made to regulators, nor was any sort of claim pursued on the Bank's directors and officers liability insurance or fidelity bond.

### e.     The City Bank Participation and Bulk Value Appraisal

79.     Even with the Oklahoma loan participations procured in September 2007, the Bank still needed another 25% participant in order to bring the loan into lending limit compliance.  Defendant Glenn tried several of his banking contacts, but no one was interested. With few, if any prospects, City National (the current lender to Merrill Construction) agreed to participate the remainder of the loan, but it also requested and it was granted last in, first out protection.  City National was a willing participant because the participation arrangement, even without the last in, first out arrangement, reduced its exposure on its loan from $3,500,000 to $500,000.

80.     City National, however, insisted that a bulk value appraisal be obtained before it would agree to participate.  Hence, the chief credit officer ordered a bulk value appraisal.  That appraisal, as of November 5, 2007, and which was received by the Bank within days thereafter, valued the property at $3,050,000, or an amount that was $950,000 less than the $4,000,000 approved loan amount.   Hence, for the first time, the Senior Loan Committee, including Jacobs, was armed with the appraisal tool necessary to help make an informed decision about the value of the property the Bank was considering financing.

81.     Had this appraisal been relied upon to underwrite the loan, as it should have been, the Senior Loan Committee, including Jacobs, would have seen that the loan-to-value ratio was 131%, far in excess of the maximum permitted under the Bank's loan policy and by federal regulation.  The loan had been approved, but there was nothing that prevented the Senior Loan Committee, including Jacobs, from withdrawing approval and halting funding of the loan.

82.     Notwithstanding this clear red flag, the loan to Merrill Construction was closed on December 19, 2007.

### f.     The Collection Efforts

83.     The Bank sold the collateral securing the debt at a foreclosure sale conducted on January 14, 2010.  The Bank made a credit bid of $1,800,000 and was the only bidder at the sale. In a letter to the loan participants, the Bank's new chief credit officer, stated as follows:

> We now have a six month period to seek a deficiency if we wish. . . [W]e suspect the enforcement of a large judgment will result in a bankruptcy filing and that the deficiency effort is not worth the additional fees/costs.

Because a deficiency judgment is necessary under Nevada law in order to pursue guarantors, this was tantamount to saying the guaranties were worthless.

### g.   The Gross Negligence and Breaches of Fiduciary Duties

The Senior Loan Committee, including Jacobs, acting jointly and in concert with one another, approved and permitted funding of the Merrill Construction loan despite at least the following:

- No bulk appraisal of the 25 lots was obtained prior to the loan approval under circumstances where lot sales in the market area had slowed, the prior lender wanted out of the loan, and the likelihood that foreclosure would be required was high.

- The appraisals relied upon by the Senior Loan Committee, including Jacobs, were retail in nature.

- One of the members of the Senior Loan Committee had warned of the accumulation of too many lot loans.

- Contemporaneous Carson City news accounts reflected record residential foreclosure rates, declining values, historically slow sales rates, and other disquieting news.

- The guarantors' financial statements reflected a $3.7 million net worth, but that was composed almost entirely of property that was exempt from execution or was illiquid, reported equity in real estate and miscellaneous personal items.

- A bulk value appraisal received after approval, but before execution of any contract documents and funding, clearly demonstrated the collateral was of inadequate value to cover the approved loan amount, yet the Senior Loan Committee, including Jacobs, permitted the transaction to close.

- Defendant Jacobs subordinated the interests in Carson River in favor of his Oklahoma banking interests in breach of his duties of loyalty and care.

### h.   The Damages

84.   The estimated losses proximately caused by the actions and failures to act of the Senior Loan Committee, including Jacobs, are as follows:

**Principal amounts advanced**

| | | |
|---|---|---:|
| | Appraisal | $3,750.00 |
| | Flood certificate | $30.00 |
| | Other loan expenses | $4,307.00 |
| | Prior lender | $3,609,530.97 |
| | Foreclosure - HOA dues | $37,534.00 |
| | Foreclosure - property taxes | $66,254.00 |
| | Foreclosure - attorney's fees | <u>$14,191.92</u> |
| | **Total** | **$3,735,597.89** |

**Recoveries**

| | | |
|---|---|---:|
| | Lot sale (1) - 7/17/08 | $160,000.00 |
| | Lot sale (1) - 8/20/10 (net) | $58,396.88 |
| | Lot sale (23) - 12/30/10 (net) | <u>$720,548.30</u> |
| | **Total** | **$938,945.18** |

| | |
|---|---:|
| Loss on loan | $2,796,652.71 |
| CRCB's 50% share of loss | $1,398,326.36 |
| Add back Lakeside's "first out" share of 6.25% | $174,790.79 |
| Add back Bank of Locust Grove's "first out" share of 6.25% | $174,790.79 |
| Add back City's "first out" share of 12.5% | <u>$349,581.59</u> |
| **TOTAL LOSS TO BANK** | **$2,097,489.53** |

## VI.    CLAIMS FOR RELIEF

85.    The FDIC realleges and incorporates by reference each of the allegations contained in paragraphs 1-84 of this Complaint as though fully set forth herein. Although Defendant Jacobs' conduct is described in detail above, the conduct by Defendant Jacobs, acting

jointly and in concert with the other members of the Senior Loan Committee, that render him liable includes, but is not limited to, the following:

a.     Approving loans to troubled borrowers on residential real estate projects whose loans were rejected for renewal by prior lenders based on appraisals that did not meet Bank and regulatory requirements and which resulted in the violations of loan-to-value requirements and otherwise failing to satisfy the standard of due care.

b.     Approving the above-described loans at a time when the residential real estate market was known to be in serious trouble.

c.     Failing to require the use of appraisals that took into account appropriate deductions and discounts given the circumstances of the troubled loans the Bank was refinancing.

d.     Failing to analyze financial information associated with the secondary sources for repayment for the above-described loans.

e.     Failing to recognize the increasing risk to the Bank with the approval of each new refinance of large residential lot loans.

f.     Failing to disclose to the other members of the Senior Loan Committee and the Board of Directors all material facts surrounding the participation of his Oklahoma banks in the Merrill Construction loan.

g.     Subordinating the interests Carson River to the interests of his Oklahoma banks in connection with the Merrill Construction loan.

## Count One

### Claim for Gross Negligence (Nevada law and 12 U.S.C. § 1821(k)

86.     The FDIC realleges and incorporates by reference each of the allegations contained in paragraphs 1-85 of this Complaint as though fully set forth herein. Section 1821(k) of The Financial Institutions Reform, Recovery and Enforcement Act holds directors and officers of financial institutions personally liable for loss or damage to the institution caused by their "gross negligence," as defined by applicable state law.

87.     In Nevada, "gross negligence" is defined as "substantially and appreciably higher in magnitude and more culpable than ordinary negligence. Gross negligence is equivalent to the failure to exercise even a slight degree of care. It is materially more want of care than constitutes simple inadvertence. It is an act or omission respecting legal duty of an aggravated character, as distinguished from a mere failure to exercise ordinary care. It is very great negligence, or absence of slight diligence, or the want of even scant care."  As further defined in Nevada, "[a] party is grossly or wantonly negligent if he acts or fails to act if he knows or has reason to know facts which could lead a reasonable person to realize that his conduct not only creates unreasonable risk of . . . harm to others but also involves high probability that substantial harm will result."

88.     As described more particularly herein, Defendant Jacobs was grossly negligent in that his manner of carrying out his duties and responsibilities to the Bank failed to constitute even a slight degree of care and demonstrated a lack of diligence that even careless men are accustomed to exercising. Moreover his actions demonstrated a complete disregard for the interests of the Bank, its policies, and the laws and regulations governing the Banking industry.

89.     The decisions made by Defendant Jacobs as described more particularly herein were not good faith business decisions made in an informed and deliberate manner. As a direct and proximate result of the gross negligence of Defendant Jacobs the FDIC has suffered damages in an amount to be determined at trial.

**Count Two**

**Claim for Breach of Fiduciary Duties**

90.     The FDIC realleges and incorporates by reference each of the allegations contained in paragraphs 1-89 of this Complaint as though fully set forth herein.

91.     The Defendant Jacobs occupied a fiduciary relationship with the Bank and is thus held to the standard of utmost good faith and loyalty. Defendant Jacobs failed to discharge his fiduciary duties as detailed in this Complaint and described in relation to the claim for gross negligence.

92.     As a direct and proximate result of the breaches of fiduciary duties of Defendant Jacobs, the FDIC has suffered damages in an amount to be determined at trial.

**VII.    JURY DEMAND**

93.     The FDIC respectfully demands a trial by jury for all issues in this case that are triable by the jury.

**VIII.   PRAYER**

WHEREFORE, the FDIC prays for relief as follows:

A.     For judgment awarding compensatory and consequential damages in at least the amount of $3,600,955.70 (together with prejudgment interest and post judgment interest) against Defendant Jacobs for his gross negligence and breaches of fiduciary duty;

B.      For its costs of suit against Defendant Jacobs; and

C.      For such other and further relief as this Court deems just and proper.

Respectfully submitted,

Gregory F. Wilson, NV No. 2517
GREGORY F. WILSON & ASSOCIATES, P.C.
417 W. Plumb Lane
Reno, NV 89509
(775) 786-7600 Telephone
(775) 786-7764 Facsimile
gwilson@wilsonquint.com


IRWIN MERRITT HOGUE PRICE & CARTHEL, P.C.
Joel R. Hogue, TX No. 09809720
Kevin Wakley, TX No. 24042110
Chase Hales, TX No. 24083124
320 S. Polk St., Suite 700
Amarillo, Texas  79101-1431
Main:  (806) 322-1440
Fax:  (806) 322-1441


By:     /s/  Joel R. Hogue                            .
Joel R. Hogue
ATTORNEYS FOR PLAINTIFF
FEDERAL DEPOSIT INSURANCE CORPORATION